UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

WALLY QUIÑONES,

               Plaintiff,

      -against-

Officer RANDY MILLER (Shield #18393),
Officer WENDELINE OLMO (Shield
#16042), Officer EBONY SIMONS (Shield
#18573), Captain "JOHN" WILLIAMS (Shield
#1201), Officer NAIROD WOODS (Shield
#8390), Officer JOHN DOE, Warden
WILLIAM COLON, Chief EVELYN
MIRABAL, Commissioner DORA SCHRIRO
and CITY OF NEW YORK,

               Defendants.

_____

15 CV 1109

Case No. _____
**ECF Case**
**Jury Trial Demanded**

Plaintiff Wally Quiñones, by his undersigned attorneys, alleges as follows:

## COMPLAINT

1.     On November 20, 2013, while visiting the Anna M. Kross Center ("AMKC") on Rikers Island, Wally Quiñones was assaulted by multiple New York City Department of Correction ("DOC") officers. They beat him around the eyes, face, and torso, sprayed him in the face with chemical spray, held him to the ground while naked, and forced him to undergo a violent rectal search. The attack sent Mr. Quiñones to the hospital, and permanently damaged his left eye. The officers also took valuable personal property from him that has never been returned.

2.     Plaintiff seeks compensatory and punitive damages, as well as costs and fees, and other appropriate relief.

3.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1985, and the laws of the State of New York.

4.  Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343(a). Plaintiff further invokes the supplemental jurisdiction of this Court to adjudicate pendent state law claims pursuant to 28 U.S.C. § 1367.

5.  Venue is proper in this district under 28 U.S.C. § 1391(b).

<u>**JURY DEMAND**</u>

6.  Mr. Quiñones demands a trial by jury in this action.

<u>**PARTIES**</u>

7.  Mr. Quiñones is currently incarcerated in AMKC. At the time of these events, he resided in Brooklyn, NY. He is a United States citizen.

8.  Defendant City of New York ("City") is a municipal corporation organized under the laws of the State of New York. The City operates numerous jails under the auspices of the DOC, including AMKC. The DOC, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those governing the security screening of visitors to AMKC, the use of force by DOC personnel, and the reporting and investigation of use of force incidents. In addition, senior officials in the Department are aware of and tolerate practices by subordinate employees in the jails, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten DOC policies or customs. The DOC is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the Defendants referenced herein.

9.     At all relevant times, Defendant Dora B. Schriro was the DOC Commissioner, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such, and acting under color of state law. On information and belief, Defendant Schriro, as Commissioner of the DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the training, supervision, and conduct of all DOC personnel, including the defendants referenced herein. As Commissioner, Defendant Schriro was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in the DOC jails. Defendant Schriro was responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel obey the laws of the United States and the State of New York. Defendant Schriro is sued in her individual capacity.

10.     At all relevant times, Defendant Evelyn Mirabal was the Chief of Department of DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such, and acting under color of state law. As Chief of Department, she was the highest ranking uniformed member of the department, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in all the DOC jails. As Chief of Department, Defendant Mirabal was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails. Defendant Mirabal is sued in her individual capacity.

11.     At all relevant times, Defendant William Colon was the Warden of AMKC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his

employment as such, and acting under color of state law.  As Warden, he was the highest ranking DOC employee at AMKC, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in AMKC.  As Warden, Defendant Colon was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in AMKC.  Defendant Colon is sued in his individual capacity.

12.     At all relevant times, Defendant Officer Randy Miller (Shield #18393) was a correction officer employed by the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  On information and belief, Defendant Miller worked at AMKC on November 20, 2013, and participated in the assault on Mr. Quiñones.  Defendant Miller is sued in his individual capacity.

13.     At all relevant times, Defendant Officer Wendeline Olmo (Shield #16042) was a correction officer employed by the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such, and acting under color of state law.  On information and belief, Defendant Olmo worked at AMKC on November 20, 2013, and participated in the assault on Mr. Quiñones, and the theft of his shoes.  Defendant Olmo is sued in her individual capacity.

14.     At all relevant times, Defendant Officer Ebony Simons (Shield #18573) was a correction officer employed by the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such, and acting under color of state law.  On information and belief, Defendant Simons worked at AMKC on November

20, 2013, and participated in the assault on Mr. Quiñones. Defendant Simons is sued in her individual capacity.

15.    At all relevant times, Defendant Captain "John" Williams (Shield #1201) (whose complete name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued here by the fictitious designation "John") was a correction captain employed by the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. On information and belief, Defendant Williams worked at AMKC on November 20, 2013, and participated in the assault on Mr. Quiñones. Defendant Williams is sued in his individual capacity.

16.    At all times relevant hereto, Defendant Officer Nairod Woods (Shield #8390) was a correction officer employed by the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. On information and belief, Defendant Woods worked at AMKC on November 20, 2013, and participated in the assault on Mr. Quiñones. Defendant Woods is sued in his individual capacity.

17.    At all times relevant hereto, Defendant Officer "John Doe" (whose name and shield number Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued here by the fictitious designation "John Doe") was a correction officer employed by the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. On information and belief, Defendant Doe worked at the Rikers Island visitors intake building on November 20, 2013, and participated in the theft of Mr. Quiñones'

personal property from his visitor locker. Defendant Doe is sued in his individual capacity.

18. Defendants Schriro, Mirabal, and Colon are collectively referred to as the "Supervisory Defendants."

19. Defendants Olmo, Miller, Simons, Williams, and Woods are collectively referred to as the "Officer Defendants."

**FACTS**

**ASSAULT OF MR. QUIÑONES**

20. Wally Quiñones was raised by his mother, who was an alcoholic, and his uncle. Between the ages of 5 and 9 years old, Wally's uncle repeatedly raped him, as well as raping his sister and another girl in the neighborhood. Eventually, his sister committed suicide, leaving Wally to discover her dead body on the floor of their bathroom. The father of the other girl discovered what Wally's uncle had been doing, and then murdered him in revenge.

21. As a result of these traumatic episodes, Mr. Quiñones began psychological treatment at the age of 9. Over the years, he also turned to drug use as a mechanism for coping with the deep trauma that he survived in his childhood. Eventually, this developed into a full-blown addiction to heroin.

22. Mr. Quiñones' addiction led to his arrest and incarceration for drug-related charges on multiple occasions.

23. As of 2013, Mr. Quiñones was incarcerated at AMKC. He was released from incarceration in July of that year.

24. Over the next few months, Mr. Quiñones would occasionally return to AMKC as a visitor. Mr. Quiñones' last visit to AMKC took place on November 20, 2013.

25. Upon arriving at Rikers Island that day, Mr. Quiñones placed personal property worth more than $500 dollars in a visitor locker.

26. He then rode the DOC bus to AMKC, passed through the first metal detector, and entered the visitors' waiting room.

27. When he joined the line of visitors waiting to enter the second screening area, a female DOC officer instructed him to go to the back of the line. Upon information and belief, this was Defendant Olmo.

28. Mr. Quiñones complied, and waited patiently at the back of the line.

29. Eventually, Mr. Quiñones was called through the security door into the second screening area.

30. After Mr. Quiñones entered the second screening area, Defendant Olmo inspected his mouth and his shoes for contraband. She placed his shoes nearby on the ground.

31. She then instructed him to raise his shirt and turn in a circle, which he did.

32. She then put her hands inside of his pants, and felt both his rear end and his crotch through the outside of his underwear.

33. Mr. Quiñones asked if she was finished with the search, to which she answered no.

34. A male DOC officer joined them. Upon information and belief, this was Defendant Woods.

35. Defendant Olmo then put her hands inside Mr. Quiñones' underwear, and groped between his butt cheeks and around his genitals.

36. Mr. Quiñones exclaimed that she was violating his rights, and asked her why she was doing this, to which she answered "shut up."

37.   Defendant Woods then approached Mr. Quiñones and punched him in the face two times in quick succession.

38.   A third DOC officer grabbed Mr. Quiñones from behind, immobilizing him.   Upon information and belief, this third DOC officer was Defendant Miller.

39.   While Defendant Miller restrained Mr. Quiñones, Defendant Woods unleashed a volley of close to 20 punches to Mr. Quiñones' face.

40.   Defendant Olmo then pulled down Mr. Quiñones' pants and underwear.

41.   At this point, other DOC officers appeared and sprayed Mr. Quiñones in the face with chemical spray.   Upon information and belief, these were Defendants Simons and Williams.

42.   While Defendant Miller held Mr. Quiñones immobile on the floor, Defendant Woods pulled apart Mr. Quiñones' legs, and began violently probing Mr. Quiñones' anus.

43.   Mr. Quiñones tried to protect himself by closing his legs, but was overpowered.

44.   The violent rectal probing injured Mr. Quiñones, causing him to bleed for days afterwards.

45.   At no time prior to or during the assault did Mr. Quiñones threaten the officers, or present any risk to their safety.

46.   After the assault, Mr. Quiñones was treated by emergency medical technicians (EMTs), who administered oxygen, and transported him to Elmhurst Hospital Center.   He was admitted overnight, and released the next day into DOC custody.

47.   As a consequence of his assault on November 20, 2013, Mr. Quiñones has been diagnosed by Corizon Medical, which subcontracts with the City to provide health care in DOC facilities, with permanent eye damage, and has been prescribed corrective lenses.

48.   The assault has also caused Mr. Quiñones significant mental anguish. Being beaten, incapacitated, and restrained -- and then suffering violent invasive trauma to his anus -- activated painful memories for Mr. Quiñones of the sustained and persistent sexual abuse he was subjected to as a little boy. Since the assault, he has experienced nightmares and other psychological symptoms caused by the re-traumatizing effect of the violent rectal search.

49.   Although Mr. Quiñones has requested the return of his personal property, which was entrusted to Defendants Olmo and Doe, the DOC and its agents have refused to return his belongings.

50.   Subsequent to the assault, the Officer Defendants composed falsified reports concerning their use of force, which conceal their illegal rectal search of Mr. Quiñones and the full extent of their violence against him, and which falsely describe their violence as acts of self-defense.

51.   On information and belief, these falsified reports resulted from an agreement among the Officer Defendants to cover up the facts of the assault.

52.   At all times relevant to this complaint, the Officer Defendants and Officer Doe acted under color of law, statute, custom, or usage of the City of New York.

53.   At all times relevant to this complaint, the Officer Defendants and Officer Doe acted within the scope of their employment as New York City DOC officers and acted on behalf of and in the interests of their employer.

54.   Mr. Quiñones filed a Notice of Claim against the City on November 20, 2014. Because this Notice was filed after the 90-day time period provided in N.Y. GEN. MUN. LAW § 50-e(1)(a), Mr. Quiñones has also filed an application for leave to serve a late notice of claim

on the City, *nunc pro tunc*, pursuant to N.Y. GEN. MUN. LAW § 50-e(5). That application is currently pending in Bronx County Supreme Court.

### NEW YORK CITY JAILS: A HISTORY OF ABUSE

55.   For decades through Department reports and civil litigation, the DOC has been aware of the routine, dangerous, and unconstitutional use of excessive force by staff at individual facilities in the large, multi-jail New York City Department of Correction.

56.   For example, *Sheppard v. Phoenix*, 210 F. Supp. 2d 250 (S.D.N.Y. 1998) (initiating injunction), was a class action that concerned the City's Central Punitive Segregation Unit (CPSU). That litigation unearthed abuse of prisoners and its cover-up, which was sufficiently serious to merit criminal prosecutions of DOC staff members.

57.   *Ingles v. Toro*, 438 F. Supp. 2d 203 (S.D.N.Y. 2006) (approving stipulation of settlement), was a system-wide class action challenging the widespread practice of using excessive force against inmates incarcerated in New York City's jails. This litigation revealed significant numbers of credible excessive force complaints from prisoners who had been seriously injured by staff in the City jails. The settlement of this class action was intended to provide meaningful improvements in the training, practice, and supervision of agency staff and investigators, and changes in the Department's use of force policy.

58.   In *Nunez, et al. v. City of New York, et al.*, 11-cv-5845 (LTS)(JCF), now pending in the district, twelve plaintiffs are pursuing a class action to remedy the ever-increasing level of unjustified, excessive brutality inflicted by DOC correctional staff on inmates in the City Jails. In that action, the plaintiffs -- composed of twelve former inmates, who suffered fourteen different assaults by correctional staff, and sustained injuries ranging from spinal injuries to facial fractures to rib fractures to concussions -- have sued the city

of New York, DOC Commissioner Schiro, and a number of current and former high-ranking officers to seek declaratory and injunctive relief that would rid the Department of the brutal conduct of its staff.

59. In addition, there have been a number of recent, highly-publicized incidents of brutal violence in the City's jails. For example, in 2012, correctional staff allegedly beat to death Ronald Spear, a chronically ill inmate, in the North Infirmary Command on Rikers Island after Mr. Spear requested medical care. In July 2014, the City agreed to pay $2.75 million to settle the wrongful death lawsuit arising from this incident.

60. In May 2012, a former assistant deputy warden and captain were charged with assaulting an inmate and falsifying use of force reports as part of a cover up, and in June 2012, a probationary captain was prosecuted on similar charges, according to reports in the Village Voice.

61. In 2012, five correctional officers, reportedly acting at the orders of former Assistant Chief of Security Eliseo Perez, Jr., led inmate Jamal Lightfoot into a search pen, and assaulted him, resulting in a fractured eye socket and nose, according to The New York Times. Chief Perez, along with nine other Department staff, including a captain, were reportedly arraigned on criminal charges relating to Mr. Lightfoot's assault and the officers' attempts to hide their misconduct by falsely claiming that Mr. Lightfoot had attempted to assault an officer, and generating false evidence to support those claims.

62. In 2013, it was reported in the media that the Bronx District Attorney's office indicted a captain at the George R. Vierno Center ("GRVC") for an unprovoked assault on an inmate.

63.	The pattern and practice of unconstitutional use of force in the City jails is highlighted by ongoing settlements of large sums to settle excessive force lawsuits. Since 2002, the city has expended millions of dollars settling lawsuits filed by inmates who suffered injuries much like the ones experienced by Mr. Quiñones. Several recently-settled and pending cases against the DOC involve serious allegations of assault by staff and injuries suffered by the plaintiffs. *See Muniz v. City of New York,* No. 12-cv-719 (S.D.N.Y.) (settled for $125,000); *Stanford v. City of New York,* No. 13-cv-1736 (S.D.N.Y.) (18-year-old inmate with fracture to forehead in camera-less search area); *Berrian v. City of New York,* No. 13-cv-1719 (S.D.N.Y.) (inmate with orbital fracture assaulted after reporting to LAS a different assault by staff).

64.	The U.S. Attorney's Office for the Southern District of New York recently released the results of an investigation under the Civil Rights of Institutionalized Persons Act ("CRIPA") into the widespread and repeated violation of the DOC's written policies on use of force. Although the report "focus[ed] on the adolescent population" on Rikers Island, the USAO noted that its "investigation suggests that the systemic deficiencies identified in this report may exist in equal measure at the other jails on Rikers."[1]

65.	The USAO concluded that the "DOC has engaged in a systemic and pervasive pattern and practice of utilizing unnecessary and excessive force" against the jail populations focused on in the report.[2] It also identified "systemic deficiencies that contribute to, exacerbate, and indeed are largely responsible for the excessive and unnecessary use of

---

[1] U.S. Department of Justice, United States Attorney, Southern District of New York, "CRIPA Investigation of the New York City Department of Correction Jails on Rikers Island" (August 4, 2014), p. 3, *available at* www.justice.gov/usao/nys/pressreleases/August14/RikersReportPR.php

[2] *Id.* at 10.

force by DOC staff."[3] These include "inadequate reporting by staff of the use of force, including false reporting," "inadequate investigation into the use of force," "inadequate staff discipline for inappropriate use of force," and "inadequate training . . . on use of force."[4] Moreover, even in cases where some use of force could be justified, DOC personnel "regularly" use force against someone "who has ceased to resist," even persons who "no longer present any actual threat or safety risk."[5]

66.     A common pattern of excessive force identified in the USAO report, and replicated in the case of Mr. Quiñones, involves using force "in locations without video surveillance."[6] The USAO found that "[a] disproportionate number of the most disturbing use of force incidents occur in these areas," which include "some search locations."[7]

67.     Overall, the USAO concluded that the DOC culture is one "in which staff feel empowered to use force inappropriately, in ways that go outside the bounds of written policies, because they know they are unlikely to face any meaningful consequences."[8] Furthermore, the DOC's "top management has failed to meaningfully address an organizational culture that tolerates unnecessary and excessive force."[9]

68.     Through all these cases and DOC reports, the Supervisory Defendants have been made aware of the widespread practice by DOC staff of using excessive force in violation of DOC's written policies. They have also been made aware of the failures of DOC's

---

[3] *Id.* at 4.

[4] *Id.*

[5] *Id.* at 15.

[6] *Id.* at 20.

[7] *Id.*

[8] *Id.* at 21.

[9] *Id.* at 44.

Investigation Division to adequately investigate allegations of misconduct, a practice that causes further abuse.

69. These Supervisory Defendants cannot credibly contend that they are unaware of the pattern of abuse that occurs with regularity in New York City jails or the failure of the DOC to take sufficient measures to investigate and discipline this abuse.

70. The DOC has not taken sufficient steps to curb the abuse that occurs on a daily basis in New York City jails. Indeed, it allows that abuse to persist through inadequate investigations of allegations of misconduct and the failure to discipline officers in the face of obvious wrongdoing.

71. Moreover, the DOC and the Supervisory Defendants have recruited, evaluated, and hired new DOC personnel using deeply dysfunctional hiring systems that exacerbate the culture of violence, false reporting, and lack of accountability outlined above.

72. As the New York City Department of Investigation (the "DOI") recently reported, the DOC hiring process suffers from "significant systemic problems that clearly contributed to a process in which many applicants with significant red flags could be hired,"[10] including such red flags as a history of violent crime, and psychological problems.[11]

73. In reviewing the job application files of 150 newly-hired DOC officers, the DOI found 54 (i.e., 36%) "had significant red flags that should have either precluded their hiring altogether or at least required significant follow up or monitoring,"[12] but that "[n]one of

---

[10] New York City Department of Investigation, "New York City Department of Investigation Report on the Recruiting and Hiring Process for New York City Correction Officers" (January 2015), p. 2, *available at www.nyc.gov/html/doi/downloads/pdf/2015/jan15/pr01rikers_aiu_011515.pdf.*

[11] *Id.* at 1.

[12] *Id.*

these necessary safety measures occurred."[13] The DOI attributed this pattern to "systemic flaws"[14] caused by "a decade or more of institutional neglect,"[15] including that the DOC "does not properly train its [hiring] staff."[16]

74.    These systemic failures on the part of DOC and the Supervisory Defendants resulted in a pattern or practice of hiring DOC officers who are unqualified and potentially dangerous.

75.    On information and belief, the systemic hiring failures outlined above contributed to the DOC's culture of violence and false reporting, as well as to hiring of the Officer Defendants who assaulted Mr. Quiñones and conspired to falsify records of the assault.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### (Officer Defendants)

76.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

77.    On the facts alleged above, the Officer Defendants are liable to the Plaintiff for using excessive force against him in violation of his Fourth and Fourteenth Amendment rights. Plaintiff's claim for a violation of his Fourth and Fourteenth Amendment rights is actionable under 42 U.S.C. § 1983.

---

[13] *Id.* at 5.

[14] *Id.* at 11.

[15] *Id.* at 3.

[16] *Id.* at 11.

## SECOND CLAIM FOR RELIEF
## 42 U.S.C. § 1983
### (Supervisory Defendants)

78.  Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

79.  On the facts alleged above, the Supervisory Defendants knew that the pattern of physical abuse described above existed in the DOC jails prior to and including the time of the assault on Plaintiff. Their failure to take measures to curb this pattern of brutality constitutes deliberate indifference to and acquiescence in the known unlawful behavior of their subordinates. The prevalence of these practices and general knowledge of their existence at the time of the assault, and the failure of these Defendants to take remedial action despite the fact that the misuse of force in DOC jails has been persistently brought to their attention, has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint.

80.  By failing to remedy the wrongs committed by their subordinates, in failing to properly train, screen, supervise, or discipline their subordinates, and by personally participating in the constitutional injuries set forth above, the Supervisory Defendants caused damage and injury in violation of Plaintiff's rights guaranteed under the United States Constitution, including its Fourth and Fourteenth Amendments, through 42 U.S.C. § 1983.

## THIRD CLAIM FOR RELIEF
## 42 U.S.C. § 1983
### (Defendant City)

81.  Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

82.  Defendant City, through the DOC, and acting under the pretense and color of law, permitted, tolerated, and was deliberately indifferent to a pattern and practice of brutality

by DOC personnel at the time of Plaintiff's assault. This widespread tolerance of abuse

by correction officers constituted a municipal pattern, practice, or custom and led to the

assault on the Plaintiff.

83.     By permitting, tolerating, and sanctioning a persistent and widespread pattern, practice,

and custom pursuant to which Plaintiff was subjected to a brutal assault, Defendant City

has deprived Plaintiff of rights guaranteed under the United States Constitution, including

its Fourth and Fourteenth Amendments, through 42 U.S.C. § 1983.

### FOURTH CLAIM FOR RELIEF
#### 42 U.S.C. § 1985
#### (Officer Defendants)

84.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth

at length herein.

85.     On the facts alleged above, the Officer Defendants are liable to the Plaintiff for

conspiring with each other to violate his Fourth and Fourteenth Amendment rights, and

by conspiring with each other to create false records of the assault so as to obstruct the

due course of justice and deprive Plaintiff of due process of law. Plaintiff's claim is

actionable under 42 U.S.C. § 1985.

### FIFTH CLAIM FOR RELIEF
#### 42 U.S.C. § 1985
#### (Supervisory Defendants)

86.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth

at length herein.

87.     On the facts alleged above, the Supervisory Defendants knew that the patterns of false

reporting and coordinated physical abuse described above existed in the DOC jails prior

to and including the time of the conspiracies against Plaintiff. Their failure to take

measures to curb these patterns constitutes deliberate indifference to and acquiescence in the known unlawful behavior of their subordinates. The prevalence of these practices and general knowledge of their existence at the time of the conspiracies against Plaintiff, and the failure of these Defendants to take remedial action despite the fact that agreements to misuse force and to create false reports in DOC jails have been persistently brought to their attention, have been substantial factors in the continuation of such agreements and a proximate cause of the constitutional violations alleged in this complaint.

88. By failing to remedy the wrongs committed by their subordinates, in failing to properly train, screen, supervise, or discipline their subordinates, and by personally participating in the constitutional injuries set forth above, the Supervisory Defendants caused damage and injury in violation of Plaintiff's rights guaranteed under the United States Constitution, including its Fourth and Fourteenth Amendments, through 42 U.S.C. § 1985.

### SIXTH CLAIM FOR RELIEF
#### 42 U.S.C. § 1985
#### (Defendant City)

89. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

90. Defendant City, through the DOC, and acting under the pretense and color of law, permitted, tolerated, and was deliberately indifferent to a pattern and practice of staff agreements to use excessive force and to create false reports by DOC personnel at the time of the conspiracies against Plaintiff. This widespread tolerance of correction officer abuse constituted a municipal pattern, practice, or custom and led to the assault on the Plaintiff.

91. By permitting, tolerating, and sanctioning a persistent and widespread pattern, practice, and custom pursuant to which Plaintiff was subjected to a conspiracy to assault and to

falsify reports, Defendant City has deprived Plaintiff of rights guaranteed under the United States Constitution, including its Fourth and Fourteenth Amendments, through 42 U.S.C. § 1985.

## SEVENTH CLAIM FOR RELIEF
### Negligent Hiring, Training and Retention of Employment Services
### (Supervisory Defendants, and Defendant City)

92.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

93.    Defendant City, through the DOC, owed a duty of care to Plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person would have anticipated that injury to Plaintiff or to those in a like situation would probably result from its conduct described herein.

94.    Upon information and believe, the Officer Defendants and Defendant Doe were unfit and incompetent for their positions.

95.    Upon information and belief, Defendant City knew or should have known through the exercise of reasonable diligence that the Officer Defendants and Defendant Doe were unfit and incompetent for their positions.

96.    Upon information and belief, Defendant City committed negligence in screening, hiring, training, disciplining, and retaining the Officer Defendants and Defendant Doe, which proximately caused each of Plaintiff's injuries.

### EIGHTH CLAIM FOR RELIEF
### Assault and Battery
### (Officer Defendants)

97.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

98.    On the facts alleged above, the Officer Defendants had no lawful basis for beating Plaintiff, subjecting him to chemical spray, restraining him, and forcibly penetrating his anus. Therefore, the Officer Defendants are liable to plaintiff under New York law for assault and battery.

### NINTH CLAIM FOR RELIEF
### Assault and Battery
### (Defendant City)

99.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

100.   On the facts alleged above, defendant City of New York is liable to plaintiff under New York law for assault and battery based on a theory of *respondeat superior* liability because its employees, the Officer Defendants, were acting in the scope of their employment when they committed assault and battery against the Plaintiff.

### TENTH CLAIM FOR RELIEF
### Aggravated Sexual Abuse in the First Degree
### (Officer Defendants)

101.   Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

102.   On the facts alleged above, the Officer Defendants had no lawful basis for forcibly penetrating Plaintiff's anus. Therefore, the Officer Defendants are liable to plaintiff under New York law for aggravated sexual abuse in the first degree.

## ELEVENTH CLAIM FOR RELIEF
### Aggravated Sexual Abuse in the First Degree
### (Defendant City)

103. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

104. On the facts alleged above, defendant City of New York is liable to plaintiff under New York law for aggravated sexual abuse in the first degree based on a theory of *respondeat superior* liability because its employees, the Officer Defendants, were acting in the scope of their employment when they committed aggravated sexual abuse in the first degree against the Plaintiff.

## TWELFTH CLAIM FOR RELIEF
### Conversion
### (Defendants Doe and Olmo)

105. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

106. On the facts alleged above, the Defendants Doe and Olmo took valuable personal property from Plaintiff and converted it to their own use. Defendants Doe and Olmo had no lawful basis for converting Plaintiff's property. Therefore, Defendants Doe and Olmo are liable to plaintiff under New York law for conversion.

## THIRTEENTH CLAIM FOR RELIEF
### Conversion
### (Defendant City)

107. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

108. On the facts alleged above, defendant City of New York is liable to plaintiff under New York law for conversion based on a theory of *respondeat superior* liability because its

employees, the Defendants Doe and Olmo, were acting in the scope of their employment when they committed conversion against the Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff requests that the Court:

1.   ENTER JUDGMENT declaring that the actions of the defendants violated the constitutional and common law rights of the plaintiff;

2.   ENTER JUDGMENT awarding plaintiff compensatory damages from Defendants, jointly and severally, in an amount to be determined at trial, for the physical, psychological, and property injuries sustained as a result of the events alleged herein;

3.   ENTER JUDGMENT awarding plaintiff punitive damages from Defendants, jointly and severally, in an amount to be determined at trial;

4.   AWARD plaintiff his costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

5.   GRANT such other and further relief as the Court deems just and proper.

Dated: New York, New York
February 17, 2015

COVINGTON & BURLING

By: _____
Thomas Odell
David L. Kornblau

The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 841-1000
todell@cov.com
dkornblau@cov.com

*Attorneys for Wally Quiñones*